FILED

2022 Mar-23  PM 04:08
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

PATRICK WALSH and          )
ALEXANDRA WALSH,           )
                           )
        Plaintiffs         )
                           )
vs.                        )          Case No.   4:20-cv-00510-HNJ
                           )
PACIFIC INDEMNITY          )
COMPANY,                   )
                           )
        Defendants         )

## MEMORANDUM OPINION AND ORDER

In this diversity case, Plaintiffs, Patrick and Alexandra Walsh, assert claims against Defendant, Pacific Indemnity Company ("Pacific Indemnity"), for breach of contract and bad faith arising from Pacific Indemnity's denial of the Walshes' insurance claim for an alleged, stolen violin.[1]   Pacific Indemnity filed a motion for summary judgment on both claims.   (Doc. 55).[2]   As elaborated below, triable fact issues prevent

---

[1] The Walshes asserted various other claims against Pacific Indemnity and other entities.   However, after several court orders addressing motions to dismiss and motions to amend, only the breach of contract and bad faith claims against Pacific Indemnity remain pending.   (See Docs. 28, 50, 51, 80).

[2] Both "Defendants" purport to jointly file the motion for summary judgment (see Doc. 55, at 1). Their summary judgment brief states "[i]t is unclear from the Court's previous Orders if Chubb & Sons, Inc., remains as a Defendant, as the Court's prior orders note that Chubb has no contractual privity with the Plaintiffs."   (Doc. 56, at 9).   However, as discussed in the previous footnote, only the breach of contract and bad faith claims against Pacific Indemnity remain pending.   Thus, the court will assess only Pacific Indemnity's entitlement to summary judgment.

the entry of summary judgment on the breach of contract claim, but the evidence warrants the entry of summary judgment on the bad faith claim, as the undisputed material facts portray that the statute of limitations bars that claim.   Accordingly, the court will **PARTIALLY GRANT** Pacific Indemnity's motion for summary judgment.

## SUMMARY JUDGMENT STANDARD

Pursuant to the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a).   The party seeking summary judgment bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.   *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

If the movant sustains its burden, a non-moving party demonstrates a genuine issue of material fact by producing evidence by which a reasonable fact-finder could return a verdict in its favor.   *Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (citation omitted).   The non-movant sustains this burden by demonstrating "that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion."   *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116

2

(11ᵗʰ Cir. 1993).   In the alternative, the non-movant may "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency."   *Id.* at 1116-17; *see also Doe v. Drummond Co.*, 782 F.3d 576, 603-04 (11ᵗʰ Cir. 2015), *cert. denied*, 136 S. Ct. 1168 (2016).

The "court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (citations omitted).   "'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'"   *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).   "Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe."   *Reeves*, 530 U.S. at 151 (citation omitted).   "That is, the court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'"   *Id.* (citation omitted).

Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."   *Celotex*, 477 U.S. at 322.   "In such a

situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322-23.   In addition, a movant may prevail on summary judgment by submitting evidence "*negating* [an] opponent's claim," that is, by producing materials disproving an essential element of a non-movant's claim or defense.   *Id.* at 323 (emphasis in original).

There exists no issue for trial unless the nonmoving party submits evidence sufficient to merit a jury verdict in its favor; if the evidence is merely colorable or is not significantly probative, summary judgment may be granted.   *Anderson*, 477 U.S. at 249. The movant merits summary judgment if the governing law on the claims or defenses commands one reasonable conclusion, *id.* at 250, but the court should deny summary judgment if reasonable jurors "could return a verdict for the nonmoving party."   *Id.* at 248.   That is, a court should preserve a case for trial if there exists "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."   *Id.* at 249.

## SUMMARY OF FACTS

Pacific Indemnity issued Policy Number 13758088-01 to Plaintiffs Patrick and Alexandra Walsh on July 1, 2013, effective until July 1, 2014.   (Doc. 57-1, at 3, 23). The policy provided $865,000 in coverage for a home located in Gadsden, Alabama, and $605,500 coverage for the home's contents.   (*Id.* at 24).   Specifically, the policy provided "Deluxe Contents Coverage," or "coverage against all risk of physical loss to

4

[the Walshes'] contents anywhere in the world unless stated otherwise or an exclusion applies." (*Id.* at 42). The policy defined "contents" as "personal property you or a family member owns or possesses." (*Id.*). The policy limited the amount of coverage available for certain items of personal property, but it did not include a limitation for musical instruments. (*Id.* at 43-44).

The policy also included "coverage against physical loss if your valuable articles are lost, damaged, or destroyed." (*Id.* at 25). The policy further stated: "This part of your Masterpiece Policy provides you with coverage against all risk of physical loss to your valuable articles anywhere in the world unless stated otherwise or an exclusion applies." (Doc. 57-1, at 50). The policy defined the term "valuable article" as "personal property you own or possess for which an amount of coverage is shown in the Valuable Articles section of your Coverage Summary." (*Id.*). The policy listed only furs as itemized "valuable articles," with blanket coverage in the amount of $30,000. (*Id.* at 25).

The policy also contemplated that more than one provision may cover the loss of a single piece of property:

> If a loss is covered under more than one part of this policy, we will pay you under the part giving you the most coverage, but not under more than one part. However, when both Valuable Articles Coverage and contents coverage are shown in the Coverage Summary, and a loss is covered under both parts, your amount of coverage will equal the combined total of both contents and Valuable Articles Coverage subject

to the Contents Special Limits and policy provisions.   In no event will we make duplicate payments.

(Doc. 58-1, at 30).

The policy defined the insured's duty to the insurance company upon suffering

a property loss, including a loss to contents or valuable articles:

**Your duties after a loss**

If you have a loss this policy may cover, you must perform these duties:

**Notification.**   You must immediately notify us or your agent of your loss.   In case of theft or accident, you must also notify the police or similar competent authority.

. . . .

**Prepare an inventory.**   You must prepare an inventory of damaged personal property, describing the property in full.   It should show in detail the amount insured under this policy and actual amount of the loss. Attach bills, receipts, and other documents to support your inventory.

. . . .

**Proof of loss.**   You must submit to us your signed, sworn proof of loss providing all information and documentation we request such as the cause of loss, inventories, receipts, repair estimates and similar records.

**Examination under oath.**   We have the right to examine separately under oath as often as we may reasonably require you, family members and any other members of your household and have them subscribe the same.   We may also ask you to give us a signed description of the circumstances surrounding a loss and your interest in it, and to produce all records and documents we request and permit us to make copies.

(*Id.* at 33-34) (boldface emphasis in original).

6

The policy also states the following under the heading "Special Conditions":

**Legal action against us**

You agree not to bring legal action against us unless you have first complied with all conditions of this policy.   For property, you also agree to bring any action against us within the time . . . limitation prescribed by Alabama law, but not until 30 days after proof of loss has been submitted to us and the amount of loss has been determined. However, the time period to bring legal action against us is extended by the number of days between the date that proof of loss is submitted and the date the claim is denied in whole or in part.

(*Id.* at 34).

In 1957, Mrs. Walsh inherited from her father a violin crafted by French luthier Jean-Baptiste Vuillaume.   (Doc. 59-1, at 10-11, 65).   Her father commissioned an appraisal of the violin during the 1950s, but she later lost the appraisal certificate, as well as the bill of sale recording her father's purchase of the violin, during a hurricane. (*Id.* at 14-16, 47).   Mrs. Walsh never commissioned another appraisal of the violin.   (*Id.* at 48).

On November 21, 2013, Mrs. Walsh prepared for a car trip at her home in Gadsden, Alabama, to visit her daughter in New Jersey.   She laid out in her driveway all the items she intended to take – including the Vuillaume violin, several other musical instruments, and some Christmas gifts – so she could appropriately pack her car.   As she reached into the car to adjust the back seat, a thief walked into her driveway, stole the Vuillaume violin and Christmas gifts, and departed in a vehicle parked near the end

of the driveway.   (*Id.* at 22-29).   The police report documenting the theft listed the value of the violin as $140,000 and the value of the case as $1.   The report did not list any Christmas gifts as stolen.   Mrs. Walsh believes another version of the police report existed, but she does not possess a copy of it.   (*Id.* at 29; Doc. 70-4, at 40).

Within a day, Mrs. Walsh contacted Pacific Indemnity to report the theft and assert a claim under the policy.   On November 22, 2013, Property Claims Adjuster Tina Brown obtained a Recorded Claims Statement from Mrs. Walsh by telephone so as to record a description of the violin and the circumstances of the theft.   Mrs. Walsh informed Brown that she did not have an appraisal for the violin, and she did not know its exact value.   She only knew its value in the 1950's approximated $15,000 to $18,000, and she recently conducted an internet search indicating "they're over $150,000 and up now."   (Doc. 59-2, at 5; Doc. 70-4, at 108).   Mrs. Walsh also reported the thieves took the violin case and bow.   She estimated the value of the case at $200, but she did not know the value of the bow.   (Doc. 59-2, at 6-7; Doc. 70-4, at 109-110).   During her September 23, 2020, deposition, Mrs. Walsh did not recall providing a statement on November 22, 2013.   (Doc. 59-1, at 38).

On November 25, 2013, Brown sent Mrs. Walsh an email informing her she would need to provide the following items to pursue her claim:

> 1.    A list of the stolen items.   Be sure to include make, model (if applicable) and approximate value of the item.

> 2.     Proof of ownership:  Appraisal or Receipts are preferred. As we discussed, a photo of the violin, credit card statements for the strings replacement, a written statement from a professional music teacher, etc can be utilized as well.
>
> 3.     A copy of the police report.  You can submit the police report number and dept. name and I can order a copy as well.
>
> 4.     The replacement cost information from an instrument store or dealer.

(Doc. 70-5, at 114).

On December 16, 2013, Brown sent the Walshes a letter requesting a copy of the police report, "[p]roof of ownership for the stolen items," and "[r]eplacement cost for the stolen items." (Doc. 59-3, at 2; Doc. 70-4, at 18). However, Mrs. Walsh testified she did not receive the letter, as Brown incorrectly typed the zip code for the Walshes' address. (Doc. 59-1, at 32-33).

On January 16, 2014, Brown sent a follow-up letter again requesting "the police report case number and proof of ownership for the stolen violin." She informed the Walshes that if they did not submit those documents within 14 days, Pacific Indemnity would place the file on inactive status, but it would nonetheless reopen the file if the Walshes provided the information after the 14-day period. (Doc. 59-3, at 5; Doc. 70-4, at 15). The delivery address for the January 16 letter included the correct zip code, but Mrs. Walsh nonetheless does not recall receiving the letter. (Doc. 59-1, at 34).

On January 20, 2014, Pacific Indemnity obtained a Professional Opinion of

Value (POV) Report from Enservio Select.   Enservio Select interviewed Mrs. Walsh, who described the stolen instrument as "a Jean Baptiste Vuillaume copy of a Giuseppe Guarneri del Gesu violin and bow, dating from the 1850's."   (Doc. 59-4, at 3; Doc. 70-5, at 110).   Mrs. Walsh further described the violin as "full 4/4 sized, slightly less 'bulky' than other violins and included 2 bows:   one made by Vuillaume and one by a maker possibly named Hill."   (Doc. 59-4, at 3; Doc. 70-5, at 110).   Mrs. Walsh did not provide photos of the violin or a professional appraisal, but she estimated the value of the instrument at approximately $150,000 based upon her internet searches.

Operating under what it characterized as "the extraordinary assumption" that Mrs. Walsh provided accurate details, Enservio Select concluded the "claimed value of $150,000.00 is reasonable and within the wide range of prices to be expected for such a rare violin."   (Doc. 59-4, at 3; Doc. 70-5, at 110).   Enservio Select also estimated the value of the Vuillaume bow at $1,600.00, and the value of the Hill bow at $3,500.00, for a total replacement value for all items of $155,100.00.   (Doc. 59-4, at 4; Doc. 70-5, at 111).

On January 23, 2014, Mrs. Walsh forwarded Pacific Indemnity a copy of the police report documenting the theft.   (Doc. 70-4, at 117).

On February 12, 2014, Pacific Indemnity assigned the claim to George Clark, an investigator.   (Doc. 70-6, at 138).   On February 14, 2014, Clark called the police detective assigned to investigate the theft.   The detective had closed the case because

10

he had no leads, and no local pawn shops had received the violin.   (Doc. 63-4, at 4;

Doc. 70-6, at 134).

On February 24, 2014, George Clark emailed Mrs. Walsh, stating:

I called and left a voice mail for you today.   It is important that we meet as soon as possible about the reported theft of a violin so that I can gather additional information from you and conduct my investigation.   I am also going to need the contact information for your daughter that has played the violin in the past in New York.   Please provide me with her name and contact information (telephone number and address).   Please let me know when it is a good time to meet with you and your husband to further discuss this claim.

(Doc. 62-1, at 2; Doc. 70-4, at 99).   Later that day, Mrs. Walsh emailed back that she

had been "recouping," and she expected her health to improve sufficiently for phone

calls and meetings in another week.   (Doc. 62-1, at 2; Doc. 70-4, at 99; Doc. 59-1, at

39).

On March 7, 2014, Clark again emailed Mrs. Walsh to determine whether her

health had improved and when she wanted to schedule a meeting.   (Doc. 62-1, at 4;

Doc. 70-4, at 98).

On March 18, 2014, Clark wrote:

I am writing to you as I have not heard from you since February 24.   This claim cannot move forward without me meeting with you and your husband to further discuss the reported theft of a violin from your property.   As such, if I do not receive any communication from you within 10 days of this email, I will assume you have abandoned your claim and you no longer wish to pursue it.

(Doc. 62-1, at 5; Doc. 70-4, at 97; Doc. 59-1, at 40).

11

Clark testified Mrs. Walsh did not respond to his request, and on April 7, 2014, Pacific Indemnity closed the file.   (Doc. 70-6, at 127).   However, Mrs. Walsh testified she either called or emailed Clark within ten days of March 18, 2014.   (Doc. 59-1, at 40).

On June 17, 2015, Mrs. Walsh requested that Pacific Indemnity reopen her claim, and it agreed to do so.   (Doc. 62-3, at 2; Doc. 70-4, at 49; Doc. 70-6, at 123; Doc. 59-1, at 41-42).

On June 22, 2015, Clark travelled to the Walshes' home in Gadsden, Alabama, to obtain an in-person Recorded Claims Statement.   (Doc. 62-4; Doc. 59-1, at 42). Mrs. Walsh confirmed she never obtained an appraisal of the violin after she inherited it from her father, and she no longer possessed a copy of her father's appraisal.   She possessed one photograph of her daughter Erikka holding the violin at age 12, and she provided that photograph to Pacific Indemnity.   (Doc. 62-4, at 23-26, 28).[3]   Clark later agreed with counsel's description of the photograph as a "long-distance shot" that did not show the inside of the violin, did not reveal any labels or signatures, and did not capture sufficient detail to identify the maker of the instrument.   (Doc. 61-1, at 3). Mrs. Walsh explained that between March 2014 and June 2015, she did not contact Pacific Indemnity about her claim because she experienced an illness and multiple

---

[3] The record does not contain a copy of this photograph.

family deaths.   (Doc. 62-4, at 33-34).

On June 26, 2015, Clark emailed Mrs. Walsh to follow up on their June 22 meeting.   He stated:

> At that meeting we discussed the violin you have reported stolen.   As you know, we will need some kind of supporting proof/evidence that you owned the specific Vuillaume violin you allege was stolen.   You told me that you have no documentary evidence (such as an appraisal) or even anyone that I could speak with that could attest to the fact that you owned this violin.   You advised me that your daughter, Erikka, had played the violin when she was younger. However, you told me that you never discussed the violin's history with her.   I advised you during our meeting that I would need to speak with your daughter, Erikka, regarding this matter.

(Doc. 62-4, at 45; Doc. 70-4, at 48).   Clark requested Erikka's contact information, and he asked the Walshes to execute a credit authorization form.   (Doc. 62-4, at 45; Doc. 70-4, at 48; Doc. 59-1, at 42-43).

On July 8, 2015, Clark emailed Mrs. Walsh, stating he had not received the information he requested on June 22.   (Doc. 59-1, at 43-44; Doc. 70-4, at 47).   In response to that email, Mrs. Walsh again provided Clark with a copy of the photograph of a young Erikka holding the violin.   (Doc. 59-1, at 44-45).

On August 10, 2015, Clark interviewed Erikka by telephone.   (Doc. 60-1, at 18). Erikka remembered she had played one of her mother's violins when she was younger, but she did not know anything about the violin's history or maker at the time.   She also did not know anything about the violin's value or condition in 2013, when it was stolen.

13

(Doc. 61-1, at 3; Doc. 63-1, at 5, 10-11).

The Walshes identified Dr. Andrew Kurtz, who conducted the Gulf Coast Symphony Orchestra and served as Erikka's violin teacher during her teenage years while the family lived in Florida, as an individual who might verify their ownership of the violin.   Clark emailed Dr. Kurtz on August 17, 2015, asking if he could provide any additional information about the violin.   On August 18, 2015, Dr. Kurtz responded:

> I was indeed Erikka Walsh's violin teacher for a time when she lived in Florida (prior to leaving for college).   She definitely played on a violin that was a Vuillaume for a time.   I know this because the year she used this particular violin, her regular one was unavailable, as it was being sent out for repair.   I was genuinely interested in the violin, since it had a great sound.   I know there was a label inside that said Vuillaume.   From my recollection, this particular violin once belonged to her Grandfather, I believe, and was passed down to her mother.

(Doc. 63-2, at 2; Doc. 70-4, at 41).

On August 19, 2015, Clark submitted a Special Investigation Unit report to Alexis Lugo, a Property Claim Examiner.   (Doc. 63-4; Doc. 70-6, at 74-80).   Clark recommended:

> There are two critical components of this reported loss.   The first is whether the Insured's can substantiate their ownership of an authentic Vuillaume Violin.   The second is whether the loss occurred as reported by the Insured's.   As a threshold matter, the first component must first be established before the second component is relevant.   The Insured's have been unable to provide and [sic] objective evidence that they owned or possessed an authentic Vuillaume Violin.   They have provided a copy of one black and white photograph that allegedly depicts Erikka Walsh playing the Vuillaume Violin.   The photograph is undated, but was allegedly taken when Erikka was an adolescent.   They have provided the

14

name of Dr. Andrew Kurtz, who was Erikka's instructor at one time. However, despite the fact that he says he recalls there being a label in the violin with the Vuillaume name, he is not an expert and the internet is replete with information regarding fake Vuillaume Violins. In fact, a legitimate Vuillaume Violin would have had more information inscribed inside the violin along with a unique stamp and number. The Insured's could not provide any documentation regarding a prior appraisal or evaluation of the alleged Vuillaume Violin. Importantly, the violin has never been scheduled as a valuable article on any Chubb policy or other insurance company policy at any time. My recommendation is to send the Insured's a letter advising that we have investigated their claim and that we have determined that no coverage can be afforded at this time. Specifically, that they have not supported their claim with documentation that would corroborate their story that the subject violin was an authentic Vuillaume Violin. Further, that should they have any documentation that would support the violin being authentic, that the documentation should be provided to us for further evaluation of their claim. Otherwise, their claim will be closed with no further action anticipated. *[sic]*

(Doc. 63-4, at 7; Doc. 70-6, at 79).

On September 11, 2015, Lugo sent the Walshes a letter stating, in part:

> In order to proceed with your claim, we need supporting documentation for the claimed items. To date, you have not submitted any documentation that would demonstrate the authenticity of the claimed violin. If you are unable to produce anything that would allow us to assess ownership and value of the claimed items, we are unable to proceed.

(Doc. 64-1, at 2; Doc. 70-4, at 21; Doc. 59-1, at 47). The letter quoted the policy provisions describing the insured's duties after a loss, and it informed the Walshes:

> We have not received any documentation from you that would demonstrate the ownership or authenticity of a Vuillaume violin. Therefore we are closing our claim at this time. In the event you wish to pursue the claim and submit the requested documentation we [will] review the documentation submitted at that time.

(Doc. 64-1, at 3; Doc. 70-4, at 22).

On September 17, 2015, Mrs. Walsh sent Pacific Indemnity an email stating her disagreement with Pacific Indemnity's conclusion she had not provided documentation to support her loss.   She requested a complete copy of Pacific Indemnity's investigatory file on her claim, as Pacific Indemnity had assigned her claim to multiple adjusters, and she believed the file lacked some "critical information" she previously supplied, including appraisal data.   (Doc. 64-2, at 2; Doc. 70-5, at 46; Doc. 59-1, at 49-50).   She stated, "I have communicated so frequently with you about my lost violin that your pointing out my duties at this point causes me to believe the facts of your investigation and my cooperation need to be looked into."   (Doc. 64-2, at 2; Doc. 70-5, at 46).   She stated:

> I am very curious to know what you have done to verify and disprove the appraisal data I sent you since you now say "If you are unable to produce anything that would allow us to assess ownership and value of the claimed items, we are unable to proceed."   Your file either contains the appraisal information I sent you or it has been lost by you and needs to be found, or if necessary, I can resend it.   Are you saying that all the proof of ownership, authenticity, and value we have presented to you amounts to nothing?   I need to understand, from examination of your file, and specific statements from you, what part of my array of proof you do not believe.   My family and I have told you how I came to own the violin, how it was stolen, provided police reports, Maestro Kurtz confirmation of the authenticity of the violin and much more[.]

(Doc. 64-2, at 2; Doc. 70-5, at 46).

16

Mrs. Walsh lamented that two years had passed without Pacific Indemnity paying the claim, and she disputed Pacific Indemnity's assertion that she had not provided sufficient proof of her ownership of the violin that "has obviously been mine for decades in my family and my life."   (Doc. 64-2, at 2; Doc. 70-5, at 46).   She complained she had repeatedly requested to receive correspondence by regular mail, yet she received Lugo's September 11, 2015, letter only by email; Pacific Indemnity employees did not return her telephone calls; and she never received notice that Pacific Indemnity closed her file in April 2014.   (Doc. 64-2, at 3; Doc. 70-5, at 47).   She further declared: "Every single thing my family and Maestro Kurtz has told you is the truth so help me God."   (Doc. 64-2, at 4; Doc. 70-5, at 48).

On September 18, 2015, Lugo sent the Walshes a letter acknowledging Mrs. Walsh's September 17 email.   (Doc. 70-4, at 23-25).   Lugo stated that Pacific Indemnity could not provide a copy of the entire claim file without a subpoena, but it could provide copies of all correspondence Pacific Indemnity sent the Walshes.   Lugo acknowledged the Walshes had "cooperated, albeit intermittently and in some cases with hesitation."   (*Id.* at 23).   Lugo reiterated that, as documentation of the Walshes' ownership of the violin, Pacific Indemnity had only received a photograph of Erikka holding the violin.   Lugo further remarked:

> While the policy of insurance provides coverage for contents, this item is so unique that some kind of credible documentary evidence will need to be provided to support your ownership of the violin.   We are not

necessarily disputing that your father played a violin or passed one on to you.   However, without supporting documentation regarding the authenticity of the violin, we cannot proceed further with your claim. The potential value of the violin is based entirely upon its' [sic] authenticity and condition.

(*Id.* at 24).  Lugo also disputed Mrs. Walsh's assertions of misrepresentations, false statements, unfair dealing, and dishonesty.   (*Id.* at 24-25).

On September 18, 2015, Mrs. Walsh sent Pacific Indemnity another email, referencing Pacific Indemnity's letter of the same date.   (*Id.* at 1-2).   Mrs. Walsh again requested a copy of her claim file, and she inquired whether Pacific Indemnity disputed the appraisal information she had sent.   She stated she had sent a police report documenting the theft, a photograph of her daughter holding the violin, and provided statements from her family members and Maestro Kurtz.   She claimed Pacific Indemnity had used "slippery" language in its previous correspondence with her, and she suggested Chubb and Pacific Indemnity had engaged in "false and misleading behavior."   (*Id.* at 2).   She requested the names of every individual who had worked on her file, and she requested that a supervisor review her claim.   (Doc. 70-4, at 2).

On October 14, 2015, Mrs. Walsh sent another email to Pacific Indemnity (the full contents of which the record does not include), and Lugo responded on October 16, 2015, stating she and her supervisor would review Mrs. Walsh's email and the claim file.   (Doc. 70-3, at 34).

On November 9, 2015, Lugo sent the Walshes a letter stating that Pacific Indemnity was in the process of reviewing her claim and would contact the Walshes when it completed the review.   (Doc. 70-5, at 40).

On November 19, 2015, Lugo sent the Walshes a letter enclosing a Sworn Statement in Proof of Loss form that required execution in the presence of a notary public.   The form required the Walshes to state the time and cause of the loss; the nature of occupancy of their home; the nature of their interest in the claimed property; any changes in the interest, use, occupancy, possession, location, or exposure of the property; any other insurance coverage for the claimed items; the actual cash value of the lost property; the whole loss and damage; and the total amount claimed.   The form also asked the Walshes to acknowledge that "[a]ny other information that may be required will be furnished and considered a part of this proof."   (Doc. 64-3, at 4; Doc. 70-5, at 37-39).

Mrs. Walsh testified she completed the enclosed form, had it notarized, and sent it back to Pacific Indemnity, via certified mail, within a week of November 19. However, she did not retain the certified mail receipt or a copy of the form she sent. (Doc. 59-1, at 54-55).

On January 5, 2016, Lugo sent the Walshes another letter to follow up on the November 19, 2015, letter.   Lugo stated Pacific Indemnity had not received an executed Sworn Statement in Proof of Loss form from the Walshes.   She included

another copy of the form, and she bade the Walshes to return an executed and notarized copy of the form by February 5, 2016.   (Doc. 64-4, at 2; Doc. 70-5, at 34; Doc. 59-1, at 56-57).

On February 26, 2016, Mrs. Walsh sent Lugo an email asking the basis for the company's continued request for documents it already possessed.   She claimed she provided a sworn proof of loss on June 22, 2015, when George Clark visited her home and obtained a recorded statement.   (Doc. 70-6, at 17).   She requested copies of her recorded statement and the names of supervisory personnel working on her claim. (*Id*.).

On March 7, 2016, Pacific Indemnity denied the Walshes' claim.   (Doc. 64-5; Doc. 70-5, at 29-33; Doc. 59-1, at 57-58).   The denial letter stated, in part:

> During Chubb's investigation, you advised that the date of loss was November 21, 2013.   You contacted us on November 22, 2013, to inform us of the loss.   An investigation was undertaken immediately for this claim.   As part of this loss, you indicated that certain items were stolen from a vehicle parked on your residence premises.   Among the stolen items was a violin.   According to your statement, the violin was inherited from a family member.   You stated the violin was a Vuillame [*sic*] violin – Guarneri Delgesu model, and that it had a significant value.
>
> Over the course of Chubb's investigation, we have requested documents and evidence that demonstrate that you owned such an item and the value of that item.   We asked you for proof of ownership you may have for the violin when you initially reported the claim.   To date, we have only received a police report and a photograph taken several years ago purportedly showing your daughter playing a violin.   These items were received in January, 2014.   Due to the lack of proof provided, as well as the value of the claimed violin and the fact that it was purported

20

to be very unique, we asked an investigator, George Clark, to obtain additional information from you regarding this item in hopes of obtaining the proof we needed to move forward with your claim.

Between February 13 and March 18, 2014, Mr. Clark made several attempts to contact you in order to make arrangements to interview you and obtain more details about the claimed violin. When Mr. Clark did not receive a response from you, he sent an email to you on March 18, 2014, and advised you that your file would be closed if you did not respond within 10 days. As you failed to respond, the file was closed after the 10 days elapsed.

We did not hear from you again until you made contact with our Western Claim Service Center on June 15, 2015, inquiring about the status of your claim. Mr. Clark contacted you on June 17, 2015 and made arrangements to meet with you on June 22, 2015. During that meeting, you were asked to provide a contact number for you daughter, Erika [*sic*], so that we could speak with her about this loss. You did not provide her number to Mr. Clark at that time and Erika [*sic*] did not contact Mr. Clark until August 10, 2015. In addition, we have interviewed Andrew Kurtz at your request who confirms that you did own a violin and that he recalls the violin containing the word "Vuillame" [*sic*] on the instrument. However, we have repeatedly requested supporting documentation from you regarding the authenticity of the violin, as the potential value of this item is based entirely upon both its authenticity and its condition. We have also asked you to complete a Sworn Statement in Proof of Loss as required under the terms of your policy. To date, however, we have not received any additional documentation, or the executed Proof of Loss. As a result, Chubb has been unable to complete its investigation with regard to this particular claim.

(Doc. 64-5, at 2-3; Doc. 70-5, at 29-30).

The denial letter also summarized the pertinent provisions of the Walshes' policy, including the "Special Conditions" language, and then it concluded:

Under the terms of your policy, and in order for Chubb to be able to complete its investigation, sufficient proof must be provided as to the

ownership, authenticity, condition and value of the items that are claimed. Your failure to provide the requested documents as well as your failure to provide the completed Sworn Statement in Proof of Loss requires Chubb to deny your claim at this time.

Please be advised that we remain willing to review any new information that was not previously provided which you believe would be relevant to our analysis.   Please provide any such information as soon as possible for our prompt review.

(Doc. 64-4, at 5-6; Doc. 70-5, at 32-33).

On December 8, 2019, Mrs. Walsh contacted Pacific Indemnity to provide additional information from a website, dated October 30, 2012, showing the value of a Vuillaume violin at approximately $155,000 to $190,000, the value of the bow at approximately $30,000, and the value of the case at approximately $200.   (Doc. 64-6, at 4-5; Doc. 70-6, at 6).   Lisa Darr, a Senior Claim Specialist, passed the information to George Clark, who responded that the new information reflected only "what the potential value of an authentic violin would be."   (Doc. 64-6, at 3; Doc. 70-6, at 5).

On December 12, 2019, Pacific Indemnity sent the Walshes a letter stating:

We have received and reviewed your email of December 8, 2019. The website link inside your email purports to reflect a violin with the same maker's name, Vuillaume, as the violin you reported as stolen.   The information you provided reflects what the potential value of an authentic Vuillaume violin might be in todays [*sic*] market.

Pacific Indemnity Company (Pacific) continues and maintains the claim denial that was mailed to you on March 7, 2016.   Over the course of Pacific's investigation, proof of ownership for the Vuillaume violin was requested.   You were unable to provide documentation of your

22

ownership of the claimed violin and Pacific was unable to complete its investigation.

(Doc. 64-7, at 2; Doc. 70-5, at 27).   Pacific Indemnity reiterated that it lacked sufficient proof of the "ownership, authenticity, condition and value" of the violin, and it maintained that the Walshes' failure to provide "the requested documents, as well as [their] failure to provide a completed Sworn Statement in Proof of Loss," justified the denial of the claim.   (Doc. 64-7, at 3; Doc. 70-5, at 28).

On February 6, 2020, Mrs. Walsh sent Darr an email stating:

> Below find my typed Sworn Statement of Proof of Loss which I believe was previously sent to one if not more of the six other Claims Specialist[s] who Chubb assigned to worked [*sic*] on my case prior to you.
>
> My oral recorded statement original[ly] was taken by George Clark who was appointed by Chubb shortly after my loss.   From then on I was assigned one Specialist after another with nothing being accomplished.   It has been a run around.
>
> My family and I and Maestro Kurtz of the Gulf Coast Symphony Orchestra gave Chubb statements which together and separately are documents proving my ownership.

(Doc. 64-8, at 2; Doc. 70-5, at 22; Doc. 59-1, at 58-59).

Mrs. Walsh did not re-send a copy of the Proof of Loss form she had previously submitted, as she had lost all copies of the form.   (Doc. 59-1, at 60).   Rather, Mrs. Walsh attached a new typed statement to her February 6, 2020, email.   She did not use the exact form Pacific Indemnity provided for a Sworn Statement in Proof of Loss, but her response did follow the same general format of that form, providing information

regarding "Time and Origin," "Occupancy," "Title and Interest," "Changes," "Total Insurance," "Actual Cash Value," "Whole Loss and Damage," and "Amount Claimed." Mrs. Walsh specified the time and date of the theft, and she requested coverage in the amount of $454,326.   (Doc. 64-8, at 3-4).   The end of Mrs. Walsh's letter contains the following lines:

> State of Alabama
>
> Alexandra Walsh Insured
>
> County of Etowah
>
> Alexandra Walsh Insured.

(Doc. 64-8, at 4; Doc. 70-5, at 23-24).   However, the document does not contain a handwritten signature from Mrs. Walsh or a notary public, nor does a visible notary seal appear on the document.   (Doc. 59-1, at 59).   Mrs. Walsh testified she derived her estimate of the amount of the loss from her internet research on the sale price of a Vuillaume violin on the Tarisio internet auction website.   (*Id.*).

On February 7, 2020, Darr responded to Mrs. Walsh's letter, stating:

> We have received and reviewed your email of February 6, 2020, which contained your typed Sworn Statement of Loss which was not signed or notarized.   In your email you advised that you, your family and Maestro Kurtz of the Gulf Coast Symphony Orchestra gave Chubb statements proving ownership.
>
> Pacific Indemnity Company (Pacific) continues and maintains the claim denial that was mailed to you on March 7, 2016.   Over the course of Pacific's investigation, proof of ownership for the Vuillaume violin was

requested.   You were unable to provide documentation of your ownership of the claimed Vuillaume violin and Pacific was unable to complete its investigation.

(Doc. 65-1, at 2; Doc. 70-5, at 25).   Darr reiterated that the Walshes' "failure to provide the requested documents, as well as [their] failure to provide a completed Sworn Statement in Proof of Loss (signed and notarized), requires that Pacific stand by its original denial of [the] claim."   (Doc. 65-1, at 3).

The Walshes filed their original state court Complaint on March 26, 2020.   (Doc. 1-1, at 3-18).   Subsequently, Pacific Indemnity, along with other Defendants no longer at bar, removed this case to federal court on April 15, 2020.   (Doc. 1).

During Mrs. Walsh's deposition, she affirmatively stated she owned the violin, though she did not know its exact value.   However, she testified she did know the instrument was "valuable."   (Doc. 59-1, at 65).

During Erikka Walsh Makic's deposition, she testified she only vaguely recalled playing the Vuillaume violin as a youth, though she remembered generally discussing with her mother the quality of the instruments she played.   (Doc. 63-1, at 5, 7). Though she had recently discussed with her mother the photo of her holding the violin at age twelve, she did not independently recall the photo.   (*Id.* at 8).   She remembered her parents telling her that thieves had stolen the violin, but she did not recall any details of the conversation.   (*Id.* at 9).   She retained no personal knowledge, apart from

25

information her mother told her over the years, about the maker or the value of the stolen violin, bow, and case.   (*Id.* at 10-11, 13).

During Dr. Kurtz's deposition, he testified he played violin professionally for 30-40 years, but he did not have any expertise in appraising violins.   (Doc. 63-3, at 4, 8). Other than the Walshes' instrument, he had never personally seen a Vuillaume violin. (*Id.* at 4, 15).   He saw the Walshes' violin approximately 100 times because Erikka played it during her lessons with him for an entire year while her other instrument underwent repairs.   (*Id.* at 5, 11).   He briefly played the violin, and he observed the face, back, and inside of the instrument.   He saw a Vuillaume label inside the violin, but he did not recall any particular details about the label.   By observing the violin, he could discern it had suffered normal wear and tear with age, but he did not recall any other physical features.   (*Id.* at 5-7, 10).   Rather, his memories focused more upon the instrument's sound quality, which he described as "beautiful."   (*Id.* at 7).   He declared, "it was clearly a very good instrument, and I have no reason to doubt that it wouldn't have been a Vuillaume."   (*Id.* at 9, 12).   After instructing Erikka during her teenage years, he did not see the Walshes' violin again.   (Doc. 63-3, at 13).

The Walshes retained Ronald Sachs, a luthier, as an expert witness.   (Doc. 65-2, at 3).   During Sachs's deposition, he testified that when appraising a musical instrument, the appraiser must consider the instrument's authenticity, condition, model, and originality of the parts.   (*Id.* at 5-6).   Sachs had frequently seen musicians play

Vuillaume violins, and in the ten years preceding his deposition, he had touched and worked on a Vuillaume violin four times.   (*Id.* at 6).

Sachs described four categories of Vuillaume violins:

The Vuillaume brand is you have the highest quality ones made by Jean-Baptiste [Vuillaume] himself.   And then his brother made instruments, and that would be called a Vuillaume 2.   And then there were ones made that were made by Nicolas Darche, and those were called Stentor 1, 2, and 3s, but they were still considered Vuillaume violins.

And then there is the factory work, which would not have been made at all by Vuillaume or his small shop, relatively, but they – he was such a famous man, that there's thousands of instruments that would have said "Vuillaume," but they're not made by him at all.

(*Id.* at 7).

Thousands of the factory-made violins exist, but only hundreds of Vuillaume's hand-made violins exist.   A factory-made edition could sell for $2,000 to $5,000, and a hand-made edition could sell for $250,000 to $350,000.   (*Id.* at 7, 9).   An expert can only distinguish a factory-made edition from a hand-made edition by physically examining the instrument.   (*Id.* at 7, 13).   Similarly, an expert can only authenticate a Vuillaume or Hill bow by physically examining it.   (Doc. 65-2, at 14).   However, Sachs did not consider himself an expert in making or identifying French bows.   (*Id.* at 14).

Sachs never examined the Walshes' violin or bows, as the Walshes retained him as an expert after the theft.   (*Id.* at 10).   He also never saw an appraisal, certificate of authenticity, repair receipt, or any other documentation regarding the violin.   (*Id.* at 11).

During his deposition, he examined the photograph of Erikka holding the violin.   He could discern that Erikka held a high quality violin, but the photo did not provide enough detail for him to identify the violin's maker.   (*Id.* at 15).   Indeed, because Sachs never personally examined the instrument, he testified he could not give an opinion regarding its value or authenticity.   Rather, he could only provide an estimate of the general value of Vuillaume violins and bows, assuming their authenticity. (*Id.* at 16).

When asked during discovery to identify "all estimates, appraisals, certificates of authenticity, or documents that show the value of the violin in question," the Walshes identified Sachs's opinion; Mrs. Walsh's representation of the purchase price her father paid for the violin in the 1950's; Mrs. Walsh's opinion that the instrument "is an original and is very unique"; Mrs. Walsh's opinion of the value; and Dr. Kurtz's assessment. (Doc. 70-3, at 4-5, ¶ 4).

On June 17, 2021, the Walshes submitted a "Sworn Statement and Proof of Loss of Patrick Walsh and Alexandra Walsh," which bore the notarized signatures of both Mr. and Mrs. Walsh.   (Doc. 65-3).   The Walshes characterized that document as "an additional attempt to provide a 'Sworn Statement' given it has been alleged the Sworn Statements already provided were not received or were not sufficient."   (*Id.* at 1, ¶ III). The Walshes described the circumstances of the theft, and then stated:

> As provided there has been an appraisal by Ronald Sachs which justifies a value range of the violin [which] was purchased sometime in the early 1950's for $15,700-15,900 [*sic*] I don't recall at this time which it was

exactly and the bow was purchased for $3,000. The seller was Mr. Roman. The instrument is an original and is very unique, so I did not have it serviced by anyone and would only allow it to be tuned by the Maestro, my daughter or her instructor. Flo Shapol[4] was the only teacher who tuned it. The loss is worth $405,000 for the three (3) pieces minimum and has likely appreciated in value. The violin was an investment piece for us and we had no plans of selling it, thus it was essentially priceless to our family. Specifically the W.E. Hill bow and the Vuillaume bow are unique and I believe to be worth as much as $55,000 or more. Dr. Andrew Kurtz has also seen the instrument and would place high value on it. Dr. Kurtz has also spoken with George Clark the investigator for the insurance company.

(*Id.* at 4). The Walshes also declared:

> My father was an instructor and in 1957 which was the year of my father's passing, I inherited the instrument. Since my father's death I have kept it safe and always in my possession. The violin was purchased in the early 1950s for $15,700-15,900 and the bow was purchased for an additional $3,000 from Mr. Roman. There have been multiple attempts to purchase the violin or comments regarding its value as a rare, original instrument of the noted French violin maker, Jean-Baptiste Vuillaume. Each of Vuillaume's instruments have appreciated in value over time and continue to appreciate in value. We consider the violin set to be worth $405,000.00.

(*Id.* at 6 (footnote omitted)).[5] The remainder of the letter addressed the Walshes' perceived problems with Pacific Indemnity's investigatory process.

## DISCUSSION

The Walshes assert Pacific Indemnity wrongfully denied their insurance claim,

---

[4] This constitutes the first (and as far as the court can discern, only) mention of Flo Shapol in the record.

[5] In the omitted footnote, the letter referenced a Wikipedia article on Jean Baptiste Vuillaume to support the assertion that Vuillaume's violins have appreciated in value.

thereby breaching the insurance contract, and that the denial constituted bad faith.   As discussed below, triable fact issues prevent the entry of summary judgment on the breach of contract claim, but the evidence warrants the entry of summary judgment on the bad faith claim as the undisputed material facts portray that the statute of limitations bars the claim.

I.   **As Triable Fact Issues Remain Regarding the Walshes' Submission of a Signed, Sworn Proof of Loss, and Regarding the Authenticity and Value of the Violin, the Court Will Deny Summary Judgment as to the Walshes' Breach of Contract Claim**

Pursuant to Alabama statute, "[e]very insurance contract shall be construed according to the entirety of its terms and conditions as set forth in the policy and as amplified, extended or modified by any rider, endorsement or application which is a part of the policy."   Ala. Code § 27-14-17(a).   "'Insurance contracts, like other contracts, are construed so as to give effect to the intention of the parties, and, to determine this intent, a court must examine more than an isolated sentence or term; it must read each phrase in the context of all other provisions.'"   *Jay v. United Servs. Auto. Ass'n*, - So. 3d -, No. 1190941, 2021 WL 2492739, at *2-3 (Ala. June 18, 2021) (quoting *Attorneys Ins. Mut. of Alabama, Inc. v. Smith, Blocker & Lowther, P.C.*, 703 So. 2d 866, 870 (Ala. 1996)).   When its intention is clear and unambiguous, the court shall enforce an insurance policy as written. *Sentinel Ins. Co. v. Alabama Mun. Ins. Corp.*, 188 So. 3d 640, 644 (Ala. 2015) (citation omitted).   Furthermore, "[i]f the terms of an insurance policy

are plain and unambiguous, the interpretation of the contract and its legal effect are questions of law." *Id.* (citing *Nationwide Ins. Co. v. Rhodes*, 870 So.2d 695, 697 (Ala. 2003)).

To recover on a breach-of-contract claim, "a party must establish: (1) the existence of a valid contract binding the parties; (2) the plaintiff's performance under the contract; (3) the defendant's nonperformance; and (4) damages." *Capmark Bank v. RGR, LLC*, 81 So. 3d 1258, 1267 (Ala. 2011) (citation omitted). Pacific Indemnity does not dispute a valid insurance contract existed between it and the Walshes, or that the contract would provide coverage for the violin if the Walshes properly established its authenticity and value. Even so, Pacific Indemnity asserts the Walshes failed to satisfy their contractual obligations because they failed to provide a Sworn Statement in Proof of Loss, and the Walshes' failure to perform excused Pacific Indemnity from its obligations under the policy.

Under Alabama law,

> an insured must comply with his or her post-loss obligations when the insured is making a claim upon the insurer, and meeting those obligations is a precondition to any duty on the part of the insurer to make a loss payment. See [*Nationwide Ins. Co. v. Nilsen*, 745 So. 2d 264, 267 (Ala. 1998)]; *Akpan v. Farmers Ins. Exch., Inc.*, 961 So. 2d 865, 872 (Ala. Civ. App. 2007). "[T]he obligation to pay or to evaluate the validity of the claim does not arise until the insured has complied with the terms of the contract with respect to submitting claims." *United Ins. Co. of America v. Cope*, 630 So. 2d 407, 411 (Ala. 1993). "[N]o case from this Court places on an insurance company an obligation to either investigate or pay a claim until the insured has complied with all of the terms of the contract with

respect to submitting claims for payment." 630 So. 2d at 412; *see also Reeves v. State Farm Fire & Cas. Co.,* 539 So. 2d 252, 254 (Ala. 1989) ("Our cases have consistently held . . . that the failure of an insured to comply within a reasonable time with such conditions precedent in an insurance policy requiring the insured to give notice of an accident or occurrence releases the insurer from obligations imposed by the insurance contract.").

*Baldwin Mut. Ins. Co. v. Adair*, 181 So. 3d 1033, 1045-46 (Ala. 2014) (alterations and ellipsis in original).  The insured's post-loss obligations can include a requirement to "furnish[] proof of loss in the form required by the policy."  *Cope*, 630 So. 2d at 412 (citing *Mordecai v. Blue Cross-Blue Shield of Alabama, Inc.,* 474 So.2d 95 (Ala. 1985)); *see also Philippou v. Am. Nat'l Prop. & Cas. Co.,* No. 2:16-CV-695-SRW, 2018 WL 6331691, at *5 (M.D. Ala. Dec. 4, 2018) (insureds failed to satisfy their post-loss obligations when they failed to submit a sworn proof of loss, despite repeated requests by the insurer); *Morton v. Auto. Ins. Co. of Hartford, Conn.,* 102 F. Supp. 3d 1248, 1260-62 (N.D. Ala. 2015) (insured failed to comply with post-loss obligations when it provided some information to the insurer, but not in the form the policy specified); *Thomas v. Safeway Ins. Co. of Alabama, Inc.,* 244 So. 3d 965, 971-72 (Ala. Civ. App. 2017) (insured did not comply with post-loss obligations when she refused to sign a proof of loss and medical authorization form, as the policy required).

The policy at issue required the Walshes to provide a "signed, sworn proof of loss providing all information and documentation [Pacific Indemnity] request[s] . . . ." (Doc. 58-1, at 33).  Thus, Mrs. Walsh's provision of a photo and police report;

32

information regarding similar violins for sale online; statements from family members and music instructors; and her personal estimates of the instrument's value would not satisfy her duties under the policy if she failed to also provide a "signed, sworn proof of loss" statement.

Mrs. Walsh testified that she submitted a signed, notarized Proof of Loss form within a week of November 19, 2015, though she did not retain a copy of the certified mail receipt indicating delivery of the form. Pacific Indemnity has no record of receiving that Proof of Loss, but a reasonable juror could credit Mrs. Walsh's testimony that she submitted it, and the court cannot assess her credibility. *See Reeves*, 530 U.S. at 150 (The court "may not make credibility determinations or weigh the evidence."). Thus, material fact disputes remain regarding whether the Walshes satisfied the policy's condition precedent of submitting a signed, sworn proof of loss, and the court cannot grant summary judgment in Pacific Indemnity's favor based upon the lack of such a statement.

Even if the Walshes satisfied the policy requirement of submitting a signed, sworn proof of loss, Pacific Indemnity also argues the Walshes failed to offer sufficient proof of the authenticity and value of the violin. *See Pyun v. Paul Revere Life Ins. Co.*, 768 F. Supp. 2d 1157, 1169 (N.D. Ala. 2011) (citations omitted) ("[T]he insured bears the initial burden of establishing insurance coverage by demonstrating that a claim falls within the insurance policy."). However, in the absence of any policy provisions

requiring the Walshes to schedule personal property above a certain value, or to provide certain, specific information for valuable personal property (such as a certificate of authenticity, etc.), the prevailing legal standards fashion a fairly straightforward burden for the Walshes.

To wit, the Alabama Supreme Court declares:

It is well settled that damages awarded for breach of contract should return the injured party to the position he would have been in had the contract been fully performed. . . .

In computing damages for breach of contract, a jury need not achieve mathematical precision. Indeed, the uncertainty which prevents a recovery is uncertainty as to the *fact* of the damage and not as to its *amount*. Thus, a plaintiff will not be denied a substantial recovery if he has produced the best evidence available and it is sufficient to afford a reasonable basis for estimating his loss.

*Target Media Partners Operating Co., LLC v. Specialty Mktg. Corp.*, 177 So. 3d 843, 861 (Ala. 2013) (citations and internal quotations marks omitted) (emphasis in original).   A plaintiff "must produce evidence tending to show the extent of damages as a matter of just and reasonable inference."   *Systrends, Inc. v. Grp. 8760, LLC*, 959 So. 2d 1052, 1076 (Ala. 2006) (citations omitted).   "The rule that one cannot recover uncertain damages relates to the nature of the damages, and not to their extent. If the damage or loss or harm suffered is certain, the fact that the extent is uncertain does not prevent a recovery."   *Id.* (citations omitted).   "When a plaintiff fails to demonstrate damage or injury attributable to the defendant's breach of contract or tortious act, a judgment

awarding damages should not stand." *Id.* (citations omitted).

The foregoing principles decidedly sustain genuine issues of fact for trial in this case, particularly as to the certainty of the Walshes' alleged loss as well as the extent of such loss.  Mrs. Walsh testified she inherited the violin from her father, and she had personal knowledge of both its authenticity and value as an original Vuillaume model. She also provided a photo of her daughter holding the violin; her daughter's testimony about playing the instrument as a youth; Maestro Kurtz's testimony that he saw a Vuillaume label inside the violin, which played and sounded like a fine instrument; a police report regarding the theft; her personal recollection of the price her father paid for the violin in the 1950's; sale prices of other Vuillaume violins; and expert testimony regarding the instrument's potential value.  Incredible as it may be, a reasonable juror could accept that evidence as sufficient to establish the Walshes owned the Vuillaume, or at least they owned some type of violin that thieves allegedly stole in 2013.  On the other hand, like Pacific Indemnity, a reasonable juror may want to see additional documentary evidence – such as an appraisal, a certificate of ownership, or a more recent photograph – or more details about the violin's label – before concluding the Walshes owned a Vuillaume or any other instrument covered under the policy, or before assigning a value to the instrument.  Because a reasonable juror could reach either conclusion, the court cannot resolve the issue on summary judgment.

Pacific Indemnity cites the Alabama Court of Civil Appeals' decision in *Nat'l Sec. Fire & Cas. Co. v. Minchew*, 372 So. 2d 324 (Ala. Civ. App. 1978), *aff'd*, 372 So. 2d 327 (Ala. 1979), for the proposition that the Walshes cannot recover any damages because they failed to offer sufficient evidence of the value of the violin, but that case is distinguishable. In *Minchew,* the insured testified everything in his home burned in a fire, but he offered no other proof of the value of the home's contents. *Id.* at 326. The Court of Civil Appeals found:

> While [the insured's testimony] is clearly competent evidence to establish the fact of the loss of the contents of the home, it is not sufficient evidence to sustain proof of the Amount of such loss. The plaintiff in a case such as this is not entitled to recover damages where the value of the property destroyed has not been established by evidence. *See, e. g., Manchester Fire Assur. Co. v. Feibelman*, 118 Ala. 308, 23 So. 759 (1898). This is so because the insurer's denial of liability, regardless of the grounds, carries with it the condition that the insured must prove the extent of his loss. *Finer Amusements, Inc. v. Citizens Ins. Co. of New Jersey*, 327 F.2d 773 (7th Cir. 1964). *See also Liverpool & London & Globe Ins. Co. v. Dickinson*, 244 Ala. 381, 13 So. 2d 570 (1943). Here, the plaintiff established the value of the house at the time of the loss at $32,000, but the record is totally barren as to any evidence indicating the value of its contents.

*Minchew*, 372 So. 2d at 326. Here, though Pacific Indemnity did not consider the Walshes' evidence sufficient to establish the authenticity and value of the violin, the record is not totally barren as to such evidence, particularly given the evidence from Dr. Kurtz regarding his examination of the violin and the expert opinion from Sachs as to the value of the supposed property. A jury must determine whether the Walshes provided sufficient evidence.

In summary, as triable factual issues remain regarding the Walshes' submission of a signed, notarized proof of loss, the Walshes' ownership of an authentic Vuillaume violin, and the amount of the Walshes' loss, the court must deny Pacific Indemnity's motion for summary judgment on the Walshes' breach of contract claim.[6]

## II.     The Statute of Limitations Bars the Walshes' Bad Faith Claim Because They Filed Suit More Than Two Years After Pacific Indemnity Denied Their Claim on March 7, 2016

As stated in the April 28, 2021, opinion on Defendants' motion to dismiss or, in the alternative, motion to strike (Doc. 51), the two-year statute of limitations for a bad faith claim begins to run "'upon the event of the bad faith refusal, or upon the knowledge of facts which would reasonably lead the insured to a discovery of the bad faith refusal.'" *Sabbah v. Nationwide Mut. Ins. Co.*, 261 F. Supp. 3d 1173, 1194 (N.D. Ala. 2017) (quoting *Jones v. Alfa Mut. Ins. Co.*, 1 So. 3d 23, 30 (Ala. 2008)). "Generally, a letter denying insurance coverage is sufficient to 'put a reasonable mind on notice'" of the bad faith claim. *Brawley v. Nw. Mut. Life Ins. Co.*, No. 2:17-CV-01513-ACA, 2018 WL 6725327, at *4 (N.D. Ala. Dec. 21, 2018) (quoting *Farmers & Merchants Bank v. Home Ins. Co.*, 514 So. 2d 825, 831-32 (Ala. 1987)).

The court addressed the accrual of the limitations period in the April 28, 2021,

---

[6] The Walshes' summary judgment briefing repeatedly references Pacific Indemnity's alleged refusal to pay a claim for the Christmas gifts stolen on the same day as the violin.   However, as the Walshes' pleadings do not assert a claim for stolen Christmas gifts, the court will not address those arguments. (*See* Doc. 1-1, at 3-18; Doc. 29).

opinion.   Pacific Indemnity argued the bad faith claim accrued on March 7, 2016, the date on which the Walshes received a letter purporting to deny their insurance claim, but the Walshes argued the claim accrued on December 12, 2019, as Pacific Indemnity did not issue a final denial until that date.   The Walshes also argued the December 12, 2019, letter newly alerted them to the potential existence of a bad faith claim through its reference to a "Special Conditions" policy provision which stated that a policyholder should not file suit against the insurance company unless it has first complied with all policy conditions, including providing proof of loss.   (Doc. 51, at 6-7).

Though the record at that time did not contain copies of the March 7, 2016, and December 12, 2019, letters, the court found the Walshes' Amended Complaint sufficiently alleged that they did not know all the facts supporting a bad faith claim until they received the December 12, 2019, letter.   Specifically, the Walshes averred "they provided an examination under oath and a sworn statement by April 8, 2016, but the December 2019 correspondence requested the same information, as evidenced by the 'Special Conditions' language regarding submission of a 'proof of loss,'" and "Pacific Indemnity perpetrated a 'pattern of delaying, denying and deceiving good faith claimants from having the proceeds due per the policy,' . . . as evidenced by a March 2020 'phone tree' evincing the 'shuffling' of their claim 'among 'specialists' in a bad faith fraudulent scheme . . . designed to deny legitimate claims.'" (*Id.* at 9 (record citations omitted)).   As those averments "just cross[ed] the line of plausibly averring

the discovery of a bad faith denial," the court allowed the bad faith claim to survive the motion to dismiss.   Even so, noting "the actual facts may not bear the Walshes' theory of liability regarding the bad faith claims," the court permitted Pacific Indemnity to "raise the statute of limitations as a defense in a future motion for summary judgment, when consideration of the relevant evidence may lead to a different result."   (*Id.*).

Pacific Indemnity has indeed reasserted its statute of limitations argument at summary judgment, asserting the evidence demonstrates the Walshes had notice of a potential bad faith claim when they received the March 7, 2016, denial letter.   The undisputed record evidence supports Pacific Indemnity's assertion.

The March 7, 2016, letter clearly and unequivocally stated that Pacific Indemnity denied the Walshes' claim.   The letter also stated reasons for the denial, including that the Walshes had not provided sufficient proof of the authenticity and condition of the violin, and they had not submitted an executed Sworn Statement in Proof of Loss. Though, as discussed above, there remains a fact dispute whether the Walshes submitted the Proof of Loss form prior to March 7, 2016, the Walshes knew as of that date that Pacific Indemnity denied the claim because it allegedly had not received the form, thereby giving the Walshes notice of a bad faith claim.   Moreover, the March 7, 2016, letter quoted the same "Special Conditions" policy language that the Walshes' previous briefs claimed first appeared in Pacific Indemnity's December 12, 2019, letter. The evidence thus clarifies that any bad faith claim based upon Pacific Indemnity's

citation of the Special Conditions provision accrued on March 7, 2016, not December 12, 2019.

Other evidence also indicates Mrs. Walsh believed Pacific Indemnity exhibited bad faith prior to the March 7, 2016, denial letter.  Mrs. Walsh's September 17, 2015, email disputed Pacific Indemnity's assertion that she failed to provide sufficient documentation for her loss, questioned the practice of assigning multiple adjusters to her file, suggested the investigation file lacked key information, and complained of inadequate communication and delays in resolving the claim.  Her September 18, 2015, email accused Pacific Indemnity of using "slippery" language and engaging in false and misleading behavior, and she requested supervisory review of her claim.  Her February 26, 2016, email complained that Pacific Indemnity continued to request documents it already possessed.  Moreover, Mrs. Walsh testified in her deposition that during September 2015, she believed Pacific Indemnity repeatedly asked her for the same items, made misrepresentations, used "slick" terms, failed to treat her in good faith, and unnecessarily delayed in resolving her claim.  (Doc. 59-1, at 79).  The foregoing evidence demonstrates the Walshes believed Pacific Indemnity engaged in wrongful conduct prior to the March 7, 2016, claim denial due to its repeated requests for the same information and assignment of multiple adjusters to Mrs. Walsh's file.

Based upon the evidence, the Walshes possessed "knowledge of facts which would reasonably lead [them] to a discovery of the bad faith refusal" by March 7, 2016,

when Pacific Indemnity denied their claim.  *Sabbah,* 261 F. Supp. 3d at 1194; *see also Brawley,* 2018 WL 6725327, at *4.  Because the Walshes filed suit more than four years later, the statute of limitations bars their bad faith claim.

The Walshes' December 2019 request to reopen the claim to consider information about another Vuillaume violin for sale online did not re-start the statute of limitations.  Though all of Pacific Indemnity's denial letters informed the Walshes the company remained willing to review any new relevant information the Walshes might acquire, other courts have persuasively ruled that an insurance company does not void a limitations period by continuing to investigate an insured's claim after the expiration of the statute of limitations.  *See Thomas v. Allstate Ins. Co.*, 974 F.2d 706, 710 (6th Cir. 1992) (citing *Broadview Savings & Loan Co. v. Buckeye Union Insurance Co.,* 70 Ohio St.2d 47, 51, 24 O.O.3d 109, 434 N.E.2d 1092, 1095 (1982)) ("The process of investigation in determining liability by an insurer does not constitute a waiver by that insurer."); *Steeplechase II Condo. Ass'n, Inc. v. Travelers Indem. Co.*, No. 17-CV-01273-PAB-NRN, 2018 WL 6571392, at *5 (D. Colo. Dec. 13, 2018) ("[A] policyholder cannot avoid the statute of limitations by making the same argument to the insurer, triggering repeated denials, and then claim that each denial restarts the statute of limitations.").

As the Walshes have provided no *new* information regarding Pacific Indemnity's alleged bad faith actions – repeatedly requesting the same information; omitting documents from the file; assigning the claim to multiple adjusters; relying upon "Special

Conditions" language; engaging in unnecessary delays; and using "slippery" wording – after December 2019, no actions taken by either the Walshes or Pacific Indemnity extended the limitations period for bad faith more than two years beyond March 7, 2016.  *See Steeplechase II Condo. Ass'n,* 2018 WL 6571392, at \*5 (insurer's decision to uphold its claim denial for the same reasons as the original denial after receiving additional information from the insured after expiration of the limitations period did not "create a different act of bad faith" triggering a timely new bad faith claim after the limitations period expired).

## CONCLUSION AND ORDER

In accordance with the foregoing, the court **PARTIALLY GRANTS** Pacific Indemnity's motion for summary judgment.  The court **DISMISSES** with prejudice the Walshes' bad faith claim, but their breach of contract claim will proceed to trial.

**DONE** and **ORDERED** this 23rd day of March, 2022.

_____
HERMAN N. JOHNSON, JR.
UNITED STATES MAGISTRATE JUDGE